UNITED STATES of America

v.

**Russell Eugene WESTON, Jr., Defendant.**

**No. CRIM. A. 98–357 EGS.**

United States District Court, District of Columbia.

Sept. 9, 1999.

Ronald L. Walutes, Jr., U.S. Attorney's Office Civil Division, Washington, DC, for U.S.

A.J. Kramer, Gregory Lawrence Poe, Federal Public Defender, Washington, DC, for Defendant.

## *MEMORANDUM OPINION & ORDER*

SULLIVAN, District Judge.

### *INTRODUCTION*

This matter is before the Court for its consideration of the Bureau of Prisons ("BOP") decision to administer antipsychotic medication to the defendant, Russell Eugene Weston, Jr., over his objection. The defendant is a pretrial detainee committed by this Court to the custody of the BOP for competency restoration pursuant to 18 U.S.C. § 4241(d). Following two administrative involuntary medication hearings ("administrative hearing"), the BOP has determined that antipsychotic medication may be administered to the defendant without his consent because: (1) he suffers from a mental disorder, (2) he is dangerous to himself and others, (3) he is gravely disabled, (4) he is unable to function in the open mental health population, (5) he needs to be rendered competent for trial, (6) he is mentally ill and medication is necessary to treat the mental illness.

Upon consideration of the BOP decision to medicate the defendant over his objection, the opposition thereto, relevant statutory and case law, the record of proceedings, evidence and arguments of counsel at two judicial oversight/evidentiary hearings ("judicial hearing"), the Court authorizes the BOP to administer antipsychotic medication to the defendant, Russell Eugene Weston, Jr., over his objection.

## BACKGROUND

The defendant has been charged in a six-count indictment with the premeditated murders of United States Capitol Police Officers Jacob J. Chestnut and John M. Gibson, the attempted murder of United States Capitol Police Officer Douglas B. McMillan, and three counts of carrying and use of a firearm during a crime of violence. The government contends that all of these events occurred on the grounds of the United States Capitol on July 24, 1998, while the victims were engaged in their official duties as federal law enforcement officers.

On October 15, 1998, after a joint request by the government and the defendant, this Court appointed Sally C. Johnson, M.D., Associate Warden Health Services, Mental Health Division, Federal Correctional Institution–Butner ("FCI–Butner"), pursuant to 18 U.S.C. § 4241(b), to conduct an outpatient psychiatric examination of the defendant to assist the Court in determining whether the defendant is competent to stand trial. At that time, the defendant's poor physical condition precluded moving him from the District of Columbia to Butner for an inpatient evaluation. Dr. Johnson then examined the defendant for approximately twenty hours, and in her November 12, 1998 report, she concluded that the defendant is incompetent to stand trial. Following a number of continuances requested by both sides, the Court scheduled a competency hearing for February 22, 1999.

After receiving Dr. Johnson's report, the government then moved to compel a second psychiatric examination of the defendant by its expert. The defendant opposed the additional examination, contending that the government had suggested the initial appointment of Dr. Johnson. On January 28, 1999, the Court granted the government's motion and, *sua sponte*, ordered an inpatient psychiatric examination of the defendant at the United States Medical Center for Federal Prisoners at Springfield, Missouri.[1] *See United States v. Weston*, 36 F.Supp.2d 7 (D.D.C.1999). The defendant appealed the Court's decision to the United States Court of Appeals for the District of Columbia Circuit and moved for a stay pending the appeal. The Court of Appeals denied both the defendant's motion for a stay and the government's motion for summary affirmance. *See United States v. Weston*, No. 99–3016, February 8, 1999 Order (D.C.Cir.) (per curiam). Thereafter, this Court rescheduled the competency hearing for April 19, 1999.

In late February 1999, the government and defense counsel informed the Court that the defendant refused to be examined by either the Court-appointed psychiatrist at Springfield or the government's expert. Since neither expert was able to examine the defendant, the Court ordered that the defendant be returned to the District of Columbia for the competency hearing. On March 16, 1999, the Court provided the parties with a pre-hearing order requiring the parties to provide information regarding the witnesses and exhibits that each side expected to present at the competency hearing. The Court also ordered the parties to brief the issue of the possible forced medication of the defendant.

On April 9, 1999, because of the inability of its expert to examine the defendant, the government withdrew its objection to a finding of incompetency, and on April 22, 1999, the Court found the defendant to be incompetent to proceed to trial pursuant to 18 U.S.C. § 4241(d). The Court then committed the defendant to the custody of the Attorney General for hospitalization and treatment to determine whether a substantial probability existed that he would attain the capacity to permit the trial to proceed in the foreseeable future. *See United States v. Weston*, Criminal Action No. 98–357(EGS), April 22, 1999 Order (D.D.C.).

---

1. The inpatient examination was to be conducted by the staff psychiatrist at the Springfield facility.

As part of the Court's Order and at the defendant's request, the Court stayed any action by the BOP to medicate the defendant without his consent and ordered the BOP to provide defense counsel with notice of any administrative hearing. *See id.*

The defendant was admitted to FCI–Butner on May 5, 1999, with Dr. Johnson as his treating physician. On May 20, Dr. Johnson requested a Court order to treat the defendant with antipsychotic medication. *See* Dr. Johnson Ltr., at 1–2 (5/20/99). According to Dr. Johnson, the defendant refused to consent to the proposed treatment, which resulted in the convening of an administrative hearing. *See* 28 C.F.R. § 549.43 *et seq.* Pursuant to administrative procedures, Mr. Ray Pitcairn, the Day Watch Nursing Supervisor, was appointed by the hearing Officer, Dr. Bryon Herbel, to serve as the defendant's Staff Representative. *See* Dr. Johnson Ltr., Notice of Medication Hearing Rights and Advisement of Rights (5/20/99).

The hearing officer determined that the defendant could be medicated against his will because: (1) he suffers from a mental disorder, (2) he is dangerous to self or others, (3) he is gravely disabled, (4) he is unable to function in the open mental health population, (5) he needs to be rendered competent for trial, (6) he is mentally ill, and medication is necessary to treat the mental illness. *See* Dr. Johnson Ltr., Involuntary Medication Report, at 7 (5/20/99). The defendant then appealed the hearing officer's decision, which was subsequently affirmed by the Warden. Dr. Johnson stated that during her interview with the defendant on May 20, the defendant "indicate[d] that he would cooperate with medication if his attorneys advised him to do so and if it was so ordered by the Court." *See* Dr. Johnson Ltr., at 2.

After the first administrative hearing, the Court exercised its judicial oversight responsibility and conducted a judicial hearing on May 28, 1999, to afford the parties an opportunity to address the BOP decision and its rationale and to afford the defendant an opportunity to cross-examine Dr. Johnson and the defendant's staff representative regarding their testimony and participation at the administrative hearing. Dr. Johnson described the process by which the decision to medicate the defendant was made as well as the substantive bases for that decision. The defendant cross-examined Dr. Johnson on all aspects of her testimony, especially focusing on the bases for her determination that the defendant is dangerous to himself and others, the potential side effects of the medication, the alternatives to medication, and the probability that the defendant will be made competent as a result of the treatment. The defendant also cross-examined the staff representative, Mr. Pitcairn, on his role during the administrative hearing.

The Court questioned the witnesses in an effort to understand the bases for Dr. Johnson's opinion to medicate the defendant and to understand the administrative hearing process that was followed. In addition, the Court questioned defense counsel regarding Dr. Johnson's statement in her May 20 letter that the defendant would cooperate with the medication if ordered by the Court. According to defense counsel, the defendant's position is that if the Court orders that he be medicated, "he is not going to force them to hold him down and inject him with medication." Hr'g Tr., at 3 (5/28/99).

After the judicial hearing, the Court remanded the decision to the BOP for further proceedings as appropriate because of the Court's concerns that the BOP had not precisely followed the Court's April 22, 1999 Order or the procedures for the administrative hearing. *See United States v. Weston,* 55 F.Supp.2d 23 (D.D.C.1999). In particular, the Court found that defense counsel had not been notified of the date of the initial administrative hearing and that the defendant's staff representative had failed to present any evidence or witnesses in support of the defendant's position.[2]

---

2. The Court was also concerned that the staff representative had not familiarized himself with the defendant's medical record. During the second administrative hearing, Dr. John-

Pursuant to the remand, Dr. Johnson provided defense counsel with notice of the date and time for the second administrative hearing. Thus, Mr. Pitcairn, who was again appointed by the Hearing Officer to serve as the defendant's Staff Representative, was able to present evidence in support of the defendant's position—a report from the defendant's expert witness, Raquel E. Gur, MD., Ph.D., Professor and Director of Neuropsychiatry, Department of Psychology, University of Pennsylvania—and to utilize talking points provided by defense counsel.[3]

After the second hearing, Dr. Herbel, the hearing officer, again determined that the defendant could be medicated against his will because: (1)he suffers from a mental disorder, (2) he is dangerous to self or others, (3) he is gravely disabled, (4) he is unable to function in the open mental health population, (5) he needs to be rendered competent for trial, (6) he is mentally ill and dangerous, and medication is necessary to treat the mental illness. *See* Dr. Johnson Ltr., Involuntary Medication Report, at 7 (7/20/99). The defendant again appealed the hearing officer's decision, which was affirmed by the Warden.

On August 20, 1999, the Court again exercised its judicial oversight responsibility and held a second judicial hearing to afford the defendant an opportunity to cross examine Dr. Johnson regarding her testimony at the second administrative hearing. Due to scheduling problems, the defendant stated that Dr. Gur could not be present. The defendant then proffered that Dr. Gur's testimony would be consistent with the report admitted at the second administrative hearing. All parties agreed that her submission should become part of the record in this case. Accordingly, the Court accepted the defendant's proffer and concluded that if Dr. Gur testified in Court, her testimony would be consistent with her written report.

## DISCUSSION

The defendant argues that the BOP's decision to medicate him against his will implicates his Fifth Amendment liberty interest in being free from unwanted medication, his Sixth Amendment rights to a fair trial and to counsel, and his First Amendment right to free expression. Moreover, the defendant contends that because these constitutionally-protected interests are implicated by the BOP's decision, the decision should not be made by BOP doctors but by a judge at a *de novo* judicial hearing. The government responds that the BOP's decision may be reviewed by this Court pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A),(D).

## I. Whether Involuntary Medication of Weston Violates Due Process

■ The defendant asserts, and the government does not dispute, that the defendant "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (citing cases). Indeed, the defendant's liberty interest is a fundamental right protected by the substantive component of the Due Process Clause of the Fifth Amendment. *See id.* at 221–22, 110 S.Ct. 1028. In the typical case, where a person's liberty interest rises to the level of a constitutionally-protected fundamental right, the Due Process Clause requires the Court to determine initially whether the government has a compelling interest in depriving the defendant of that liberty interest and whether the *deprivation is narrowly tailored to the government's interest.* If

---

son indicated that in preparation for the second hearing, she encouraged the staff representative to review the record and observed him doing so. *See* Hr'g Tr. of Involuntary Medication Hearing of Russell Weston, at 21 (7/8/99).

3. Defense counsel declined to attend the hearing based upon Dr. Johnson's representations that they would only be allowed to attend as witnesses or observers.

these conditions are met, then the procedural component of due process requires the Court to determine the constitutionally minimum procedural safeguards required to accomplish the government's deprivation of the individual's liberty interest. Where the liberty interest involved is in avoiding the unwanted administration of antipsychotic drugs held by one within the criminal justice system, however, the Supreme Court's due process analysis has been more nuanced.

## A. *Case Precedent*

In *Harper*, the Supreme Court confronted the issue of forced medication after a Washington state prisoner refused to continue taking antipsychotic medication. *See Harper*, 494 U.S. at 214, 110 S.Ct. 1028. Approximately six years earlier, the prisoner had been convicted of robbery and was eventually incarcerated at a correctional institute for treating felons with serious mental disorders. *See id.* His treating physician then sought to medicate him over his objection, *see id.,* and after following the state administrative procedures, the facility determined that the defendant should be medicated against his will. *See id.* at 217, 110 S.Ct. 1028. The prisoner was medicated against his will for approximately two-and-a-half years, and he then filed an action under 42 U.S.C. § 1983, claiming that the prison's failure to provide him with a judicial hearing before medicating him against his will violated, *inter alia,* due process. *See id.* The Washington State Supreme Court agreed, holding that the prisoner was entitled to "a judicial hearing at which the inmate [would have] the full panoply of adversarial procedural protections" and that the State was required to prove by " 'clear, cogent and convincing' " evidence that the "medication was both necessary and effective for furthering a compelling state interest." *Id.* at 218, 110 S.Ct. 1028 (citation omitted).

Holding that the state administrative procedures met the requirements of due process, the United States Supreme Court reversed. *See id.* at 236, 110 S.Ct. 1028. With regard to the substantive standard used to determine whether a dangerous prisoner could be forcibly medicated, the *Harper* Court held:

> [G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.

*Id.* at 227, 110 S.Ct. 1028. As to whether the prisoner was entitled to a judicial hearing prior to being medicated, the Court concluded:

> Notwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge. The Due Process Clause "has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer." Though it cannot be doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms.

*Id.* at 231, 110 S.Ct. 1028 (internal citations omitted). As to judicial review of the state's decision, the Court noted that:

> [U]nder state law an inmate may obtain judicial review of the hearing committee's decision by way of a personal restraint petition or petition for an extraordinary writ, and that the trial court found that the record compiled under the Policy was adequate to allow such review.

*Id.* at 235, 110 S.Ct. 1028.

Later, in *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), the Supreme Court heard the appeal of a defendant who had requested the state trial court to suspend the administration of antipsychotic medication during his

trial so that he could show jurors "his 'true mental state'" in support of his insanity defense. *Id.* at 130, 112 S.Ct. 1810 (citation omitted). The trial court "denied [the defendant's] motion to terminate medication with a one-page order that gave no indication of the court's rationale." *Id.* at 131, 112 S.Ct. 1810. The Supreme Court reversed his state court convictions for murder and robbery stating:

> Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means.

*Id.* at 135, 112 S.Ct. 1810 (internal citation omitted). The Court articulated neither the method by which the trial court should make this determination nor the burden of proof on the government to make its showing.

Following the Supreme Court's decision in *Riggins*, the Sixth Circuit grappled with the issue of forced medication in *United States v. Brandon*, 158 F.3d 947 (6th Cir. 1998). There, the defendant had been found incompetent to stand trial on the criminal charge of sending a threatening letter through the mail. *Id.* at 949. The precise issue facing that court was "whether the Due Process Clause of the Fifth Amendment requires a judicial hearing to determine whether a *non-dangerous* pretrial detainee can be forcibly medicated in order to render him competent to stand trial." *Id.* at 950 (emphasis added). It was uncontroverted that the sole reason the defendant was being medicated against his will was to render him competent to stand trial, *see id.* at 949–50, and the Court "conclude[d] that the decision to medicate a non-dangerous pretrial detainee must survive strict scrutiny." *Id.* at 960.

Because the *Brandon* Court found that "the key decisions to be made in the present case involve non-medical issues, such as the effect the medication will have on Brandon's right to a fair trial and his right to counsel," it found great risk in having the decision to medicate the defendant against his will be made by persons with no legal training. *Id.* at 956. As to the government's burden of proof, the court stated that "[w]e believe that the risk of error and possible harm involved in deciding whether to forcibly medicate an incompetent, non-dangerous pretrial detainee are likewise so substantial as to require the government to prove its case by clear and convincing evidence [at a judicial hearing]." *Id.* at 955, 961.

### B. *Analysis*

■ *Harper, Riggins,* and *Brandon* articulate three different substantive standards that could be applied depending on the defendant's status and the asserted government interest. *See Harper,* 494 U.S. at 222, 110 S.Ct. 1028; *Riggins,* 504 U.S. at 135, 112 S.Ct. 1810; *Brandon,* 158 F.3d at 960. Where, as in *Harper,* the defendant has been convicted and is incarcerated, his liberty has been diminished. Accordingly, the government need not meet the stringent requirements of strict scrutiny to medicate an inmate without his consent to render him non-dangerous. Rather, the government may deprive an inmate of his fundamental liberty interest in avoiding involuntary medication so long as the deprivation is "'reasonably related to legitimate penological interests.'" *Harper,* 494 U.S. at 223, 110 S.Ct. 1028 (citation omitted).

As to pretrial detainees, the standard varies. The Supreme Court has acknowledged that a pretrial detainee's liberty interests are at least equal to that of a convicted prisoner. *See Riggins,* 504 U.S.

at 135, 112 S.Ct. 1810; *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Consequently, where, as here, the government seeks to medicate a pretrial detainee forcibly on dangerousness grounds, the government again may avoid the requirements of strict scrutiny and need only show that "treatment with antipsychotic medication [is] medically appropriate and, considering less intrusive alternatives, essential for the sake of [the defendant's] own safety or the safety of others." *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810.

Where the government seeks to involuntarily medicate a pretrial detainee so as to render him competent to stand trial, however, the Supreme Court has recognized that the government may "[be] able to justify medically appropriate, involuntary treatment with the drug by establishing that it [cannot] obtain an adjudication of [the defendant's] guilt or innocence by using less intrusive means." *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810. Finding that question not squarely presented, however, the Court in *Riggins* was unwilling to adopt strict scrutiny as the applicable standard, *see Riggins*, 504 U.S. at 136, 112 S.Ct. 1810, but the Court rested its holding in part on the absence of any finding by the trial court that "safety considerations or other compelling concerns outweighed Riggins' interest in freedom from unwanted psychotic drugs." *Id.* The Sixth Circuit, by contrast, has squarely held that strict scrutiny is the applicable standard where the government's only asserted interest in involuntary medication is to render the defendant competent to stand trial. *See Brandon*, 158 F.3d at 960.

The parties have not cited to, and this Court is unaware of, any cases that address a scenario in which the government seeks forced medication of a defendant both to quell the defendant's dangerousness and to render him competent to stand trial. This Court holds that at this stage of the proceedings, where the defendant has not yet been arraigned and where there is no record evidence to suggest that the government's medical reasons are pretextual, the Due Process Clause requires the government to satisfy only the *Riggins* "medically appropriate" standard. In the event that medication successfully renders the defendant competent to stand trial, the Court could then reach the defendant's argument that the Due Process Clause or the Sixth Amendment will require a heightened showing before the defendant may be forcibly medicated during the trial. This case is not in that posture, however, and the Court will not attempt to resolve those issues unless and until they are ripe, assuming the defendant seasonably renews his objection in advance of trial.

Accordingly, at this stage of the judicial proceedings, the substantive component of the Due Process Clause entitles the defendant to remain free from unwanted medication unless the government can show, to a reasonable degree of medical certainty, that treatment with antipsychotic medication is medically appropriate and, considering less intrusive alternatives, essential for the sake of the defendant's own safety or the safety of others. *See Riggins*, 504 U.S. at 135–36, 112 S.Ct. 1810. The government has clearly met its burden here.

### 1. Whether the Proposed Treatment is Medically Appropriate

■ The defendant argues that the proposed treatment is not medically appropriate. The defendant's expert, Dr. Gur, agreed with Dr. Johnson that the defendant "meets diagnostic criteria for Paranoid Schizophrenia and is not competent to stand trial." Dr. Gur Ltr., at ¶ 3 (7/7/99). Dr. Gur, however, disagreed with Dr. Johnson's opinion that the defendant should be treated with antipsychotic medication. Rather, Dr. Gur's "opinion within a reasonable degree of medical certainty is that antipsychotic medication will not restore Mr. Weston's competency." *Id.* at ¶ 4. Dr. Gur explained the basis for her opinion as follows:

> In light of the length of time (about two decades) that he has experienced delusions, the pervasiveness of his delusional

system, lack of treatment, and the unfortunate fact that he has acted on his delusions, make it extremely unlikely that medication will eliminate or substantially attenuate his delusions. There is a growing body of evidence that suggest[s] that when the psychotic process remains untreated it causes further deterioration in brain function resembling an irreversible toxic effect.

*Id.* When Dr. Gur's opinion was discussed during the second administrative hearing, Dr. Johnson persuasively articulated her disagreement with Dr. Gur's assessment that the defendant has experienced delusions in their current form for twenty years. Dr. Johnson responded that:

If you look back historically, as he was evaluated early on, he presented with a mixed symptom picture, and actually carried a severe personality disorder diagnosis with paranoid features, rather than a full-blown diagnosis of schizophrenia. And it's only been in the later years, particularly from 1996 to present, that we have seen this full-blown delusional system.

Hr'g Tr., Involuntary Medication Hearing of Russell Weston, at 58–59 (7/8/99).

Further, at the August 20, 1999 judicial hearing, Dr. Johnson testified that she disagreed with Dr. Gur's assessment on the following grounds:

I think the standard of care in someone suffering from this type of symptom picture would be to treat them with medication, because you are unable to predict in the individual case whether that individual will actually respond. What we do know is somewhere upwards of 80 percent of people suffering from schizophrenia have significant response to medication intervention with their symptom picture. And so given that high degree of response, I would certainly want to attempt to treat the individual. I have found that patients who have had very little treatment over the years often have a higher likelihood of response than people who have been chronically treated and just continue their medicine.

There seems to be a phenomena that people who are treated and then discontinue medicine, and treated and discontinue medication, may actually be less responsive to treatment in the long run. In Mr. Weston's case, he has had very little exposure to treatment, and I think ... that is one of the reasons that I think there is a good likelihood that he'll have a positive response, positive in the sense that his symptoms will diminish in response to treatment.

But I think Dr. Gur's statement of not treating an identified severely ill schizophrenic patient with medication is certainly not the status in the field. There would be few psychiatrists who would step forward and say, "I would simply say this patient is not going to respond", rather than offer them a trial of treatment. That's a very unusual position to take.

Hr'g Tr., at 56–57 (8/20/99).

At the first judicial hearing, Dr. Johnson was cross-examined at length by defense counsel regarding the possible side effects of antipsychotic medication and the various methods by which the side effects can be controlled, either by prescribing side effect medication, changing the medication, changing the dosage, or changing the time of day the medication is given. Hr'g Tr., at 70–111 (5/28/99). At the second judicial hearing, Dr. Johnson testified that the potential benefits to treating the defendant far outweigh the risks because those risks can be controlled. Hr'g Tr., at 73 (8/20/99).

The defendant presented no expert testimony to contradict Dr. Johnson's testimony regarding side effects. In fact, despite Dr. Gur's opinion that the defendant should not be medicated, she stated that if medication were to be used, the defendant should be given atypical antipsychotic agents because they "have better side effect profiles, are better tolerated and are effective on a broader range of symptoms." Dr. Gur Ltr., at ¶ 5 (7/7/99).

The Court accepts Dr. Johnson's opinion as the more persuasive of the two opinions. Based upon Dr. Johnson's reasons for disagreeing with Dr. Gur—that the defendant has not been presenting his present symptom picture for twenty years and that approximately 80 percent of people suffering from schizophrenia have a positive response to medication treatment, the Court is persuaded that the government has proven, to a reasonable degree of medical certainty, indeed, by at least clear and convincing evidence, that the proposed medication is medically appropriate. Further, as Dr. Johnson testified at the second judicial hearing, the Court is persuaded that the potential benefits of treating the defendant with antipsychotic medication far outweigh any burdens associated with that treatment. Moreover, as she opined, the potential risks can be adequately monitored on a day-to-day basis and controlled by the selection of the medication, the use of side effect medication if necessary, and the close monitoring and intervention for side effects. Finally, the Court accepts Dr. Johnson's opinion because it is better substantiated and because Dr. Johnson has had more extensive interaction with the defendant over the past eleven months.

### 2. Whether, Considering Less Intrusive Alternatives, the Proposed Treatment is Essential for the Defendant's Own Safety or for the Safety of Others

■ The parties do not dispute that since the defendant's arrest on July 24, 1998, he has not attempted to harm himself or anyone else. In addition, the defendant's medical records reveal only one incident prior to the charged offense where he harmed another person. This incident occurred during his hospitalization in Montana in 1996. Finally, it can hardly be disputed that the defendant endangered himself at the Capitol on July 24, 1998, and sustained serious injuries as a result.

During the second administrative hearing, Dr. Johnson provided three fundamental and extremely persuasive and compelling reasons for determining the defendant to be dangerous to himself and others.[4] First, Dr. Johnson stated that the evidence clearly indicates that the defendant has acted on his delusions in the past. *See* Hr'g Tr. of Involuntary Medication Hearing of Russell Weston, at 51 (7/8/99). Both because his delusions have "expanded" since Dr. Johnson first examined him in November 1998 and because he tends to incorporate the persons around him into his delusions, those around the defendant are at risk of harm. *See id.* Second, the defendant's delusions have resulted in his placing himself in a high-risk situation where the risk of serious injury was great and ultimately realized. *See id.* Finally, Dr. Johnson concluded that the defendant posed a risk of harm to himself given the statistical risk of depression and suicide for persons diagnosed with schizophrenia, whether or not they are treated. *See id.*

In order to mitigate the risk of danger, the defendant is currently housed in Butner's Seclusion Admission Unit and is under 24–hour observation by a guard posted outside the defendant's room. Dr. Johnson testified that she has imposed these conditions because she "do[es] not feel [she] can safely predict that [the defendant] will not harm himself." Hr'g Tr., at 66 (8/20/99). She further testified that it is her opinion that when she and other staff members go into his room, doing so "poses some immediate risk of potential harm" to herself and to those persons. *Id.* at 25. Dr. Johnson mentioned that based on her own observations and the reports of other Butner staff members, the defendant has become increasingly surly and hostile in his interactions with staff over the past few weeks. *See id.* at 25, 29. Dr. Johnson also noted that the defendant now refuses to respond to questions regarding suicide,

---

4. At the August 20, 1999 hearing, Dr. Johnson explained that she made this dangerousness determination after considering the defendant's current mental status, his support systems, his strengths in being able to cope and handle situations, and the history of his behavior. Hr'g Tr., at 64 (8/20/99).

whereas in November 1998, he would at least deny any intention to harm himself. *See id.* at 24. As a result, Dr. Johnson stated that she is of the opinion that the defendant continues to pose a risk of harm to himself and others, and that, in fact, she now "perceive[s] him to pose a greater potential risk of harm to himself and others [now] than . . . in . . . November." *Id.* at 64.

Aside from extensive cross-examination of Dr. Johnson during the two judicial hearings on the reasons for her opinion that the defendant is dangerous to himself or others, and although given the opportunity at the second administrative hearing, the defendant has presented no evidence, expert or otherwise, to contradict Dr. Johnson's dangerousness assessment. The defendant asserts, however, that the government's dangerousness finding is really a pretext for medicating the defendant to render him competent to stand trial. In the opinion of the Court, however, the evidence in this case clearly does not support this naked assertion. Rather, the record supports Dr. Johnson's testimony that she has considered the defendant to be a danger to himself and others since she completed her initial evaluation of him in November 1998 and that she now is of the opinion that the risk has been exacerbated. *See* Hr'g Tr., at 50 (5/28/99); Hr'g Tr., at 64–65 (8/20/99).

The defendant appears to suggest that maintaining the status quo, i.e., twenty-four-hour observation in a restricted environment, is a less intrusive alternative that will prevent him from being dangerous to himself or to others. Again, however, the Court is persuaded by Dr. Johnson's testimony that no alternatives exist that would render the defendant not dangerous and that no alternatives exist that would treat the defendant. Further, the Court credits Dr. Johnson's testimony that she has "considered at length" and rejected alternative treatment interventions such as individual psychotherapy and group therapy as treatment alternatives that would not have "any impact" on the defendant's mental illness.

Hr'g Tr., Involuntary Medication Hearing of Russell Weston, at 55–56 (7/8/99).

Finally, the defendant maintains that civil commitment is an acceptable less intrusive alternative, but the defendant has presented no evidence to support the assertion that civil commitment, without any treatment whatsoever, would somehow render him non-dangerous or treat him. Furthermore, civil commitment pursuant to 18 U.S.C. § 4246 is an option that may be pursued in this case at a later date should treatment prove ineffective.

In view of the overwhelming, compelling evidence to support Dr. Johnson's opinions and the entire record herein, this Court concludes that administering antipsychotic medication to the defendant is medically appropriate and that no less intrusive means exist by which the safety of the defendant or those around him can be ensured. As Dr. Johnson testified, the standard of care in treating the defendant's symptom picture is medication intervention. Moreover, at this time, the defendant must be observed 24 hours a day to ensure that he does not harm himself, and furthermore, persons who enter the defendant's room put themselves at risk for potential harm.

3. **Whether the Government is Required to Establish that it Cannot Obtain an Adjudication of the Defendant's Guilt by or Innocence with Less Intrusive Means**

█ The initial reason for defendant's commitment to the custody of the Attorney General was for treatment to render him competent to stand trial on two counts of premeditated murder of two federal police officers, one count of attempted murder of a third federal police officer, and three counts of carrying and use of a firearm during a crime of violence. The government contends, and the Court concurs, that it indeed has a fundamental interest in bringing the defendant to trial and that this interest overrides the defendant's own liberty interest in remaining free from un-

wanted medication. *See Riggins,* 504 U.S. at 134–35, 112 S.Ct. 1810; *see also Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace.") (parallel citations omitted); *Khiem v. United States,* 612 A.2d 160, 167 (D.C.1992) ("[T]he government's interest [in bringing a murder defendant to trial] is a 'fundamental' one and of a very high order indeed."). Nevertheless, the case law does not clearly indicate whether the government can forcibly medicate a defendant solely to render him competent to stand trial.

■ Dicta in *Riggins* intimates that the government may be "able to justify medically appropriate, involuntary treatment with … drug[s] by establishing that it could not obtain an adjudication of [the defendant's] guilt or innocence by using less intrusive means." 504 U.S. at 135–36, 112 S.Ct. 1810. The *Riggins* Court, however, stopped short of articulating either the circumstances under or standard by which the Court could medicate a defendant solely to render him competent to stand trial.

Arguably, if a compelling case ever existed under *Riggins* that would justify forcibly medicating the defendant solely to become competent to stand trial, this case clearly meets that standard. However, *Riggins* indicates that if treatment is justified on dangerousness grounds, as it is in the present case, the Court need not reach the issue whether the defendant may be treated solely to render him competent to stand trial. Therefore, in the absence of substantive guidelines and in view of the well-developed body of case law that sanctions the forced medication of a defendant on dangerousness grounds, the Court need not reach the collateral issue at this time.

## II. *Whether the Procedure in this Case Satisfies Due Process*

In order to comply with due process, the government must also demonstrate that the procedures it used during the administrative hearings were sufficiently fair to the defendant. The determination of what procedures are required before the government may deprive an individual of a protected liberty interest is made by balancing the private individual's interests, the government's interests, and the risk of an erroneous deprivation of the private individual's interests through the administrative procedure in place. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

### A. *The Private Individual's Interests*

■ It is well-settled, and indeed the parties do not dispute, that the defendant "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (citing cases); *see also Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). As an initial matter, however, due process is an issue only when the private individual's interests and the government's interests are adverse. Here, these interests are adverse because the defendant has refused to consent to medication. Thus, defense counsel have suggested that the Court determine whether the defendant is competent to refuse to consent to medication.

At the May 28, 1999 judicial hearing, the Court asked Dr. Johnson if she had an opinion as to whether the defendant was competent to refuse medication. Dr. Johnson opined that the defendant is competent to make this medical decision because:

> [H]e [is] competent to understand the information about the medicine and the potential side effects and be able to report them so that they could be monitored …. He remembers his previous treatment and what was told to him about that. He was able to process the information I gave him about the medication. He understands that I am proposing to treat him for the illness. He

disagrees that he is ill but he understands what the symptom pictures that I am seeing are and what the target symptoms would be. So I believe that he would be able to have sufficient understanding to work with me around the medication issue.

Hr'g Tr., at 42–43 (5/28/99). At the second administrative hearing, in response to the hearing officer's questions about Dr. Johnson's efforts to educate the defendant about the proposed treatment, Dr. Johnson stated:

Since his return [to Butner from the District of Columbia to attend the May 28, 1999 judicial hearing], in my discussions with him about medication, ... he shakes his head yes or no in response to questions I ask him about the medicine .... He will not verbalize at this point any questions to me about the medication, or any verbalized understanding, although it is my perception that he does understand the information that I convey to him.

Hr'g Tr. of Involuntary Medication Hearing of Russell Weston, at 9 (7/8/99).

Moreover, although the defendant refused both to choose a staff representative for the second hearing and to sign the form indicating that he received notice of the second hearing and an explanation of the procedure, Dr. Johnson stated that the defendant "clearly presented to [her] an understanding [of] his rights at the hearing [and of the fact] that he was receiving notice of the hearing." *Id.* at 22. Further, at the conclusion of the second administrative hearing, the hearing officer explained that the defendant could appeal the decision to the Warden at FCI–Butner and told the defendant that he would not be medicated unless the Court ordered medication. *See id.* at 66. The hearing officer concluded by asking the defendant if he understood what was said, and the defendant responded affirmatively. *See id.* As he did after the first administrative hearing, the defendant appealed the decision to the Warden.

Despite the defendant's suggestion that the Court determine whether he is functionally competent to make medical decisions and, if he is not, to appoint a guardian *ad litem*, the defendant has failed to present any evidence to contradict Dr. Johnson's opinion that he is competent to consent to the medication. *Cf. Woodland v. Angus*, 820 F.Supp. 1497, 1502–04 (D.Utah 1993) (finding plaintiff incompetent to make medical decision based upon the testimony of four medical professionals). Furthermore, the defendant has not argued that due process principles require that the Court in the first instance determine the defendant's competence to make medical decisions. *See State v. Garcia*, 233 Conn. 44, 658 A.2d 947, 969–70 (1995) ("Because we are not confident that the appointment of a health care guardian is required by applicable due process principles, but because we are nonetheless convinced of the wisdom of such an appointment in an appropriate case, we reach this determination on the basis of our supervisory powers over matters of criminal justice, rather than under the federal due process clause."); *In re Ollie Bryant*, 542 A.2d 1216, 1217 n. 2 (D.C.1988) (reserving consideration of the issue of "whether due process requires judicial resolution of the question of a mentally ill patient's competency to make a treatment decision" because the issue was neither litigated nor necessary to the trial judge's decision). Accordingly, in view of the foregoing, it is not necessary for the Court to appoint a guardian *ad litem*.

### B. *The Government's Interests*

The government's interest in medicating the defendant against his will is multifaceted. The government has an interest in treating the defendant pursuant to the statute under which he was committed to the custody of the Attorney General:

The Attorney General shall hospitalize the defendant for treatment in a suitable facility—

(1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed[.]

18 U.S.C. § 4241(d). Pursuant to this commitment, Dr. Johnson determined that the defendant should be administered antipsychotic medication for a number of reasons. These reasons include treating the defendant's mental illness and making him non-dangerous to himself and others. Moreover, as previously discussed, the government may have a compelling interest in medicating the defendant to render him competent to stand trial. *Riggins* 504 U.S. at 135, 136, 112 S.Ct. 1810; *see also Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring).

### C. *The Risks of an Erroneous Deprivation of the Private Individual's Interests as a Result of the Administrative Process*

The *Harper* Court held that a dangerous prisoner could be medicated against his will pursuant to the state administrative process, *see Harper,* 494 U.S. at 231, 110 S.Ct. 1028, and that a judicial hearing with "the full panoply of adversarial procedural protections" was unnecessary. *Id.* at 218, 110 S.Ct. 1028. In contrast, because the *Brandon* court concluded that the defendant's Sixth Amendment rights to a fair trial and to counsel were implicated by the decision to medicate, the *Brandon* court ruled that a non-dangerous pretrial detainee was entitled to a *de novo* judicial hearing. *Brandon,* 158 F.3d at 955.

### 1. *The Administrative Framework*

Here, the decision to medicate the defendant was made pursuant to procedures promulgated by the BOP at 28 C.F.R. § 549 *et seq.* following the Supreme Court's decision in *Harper.* These regulations track those approved by the *Harper* Court and establish the procedural safeguards to protect an inmate prior to being medicated without his consent. *See* 57 Fed.Reg. 53820 (1992). According to these regulations, an individual who does not consent to medication is given an administrative hearing with the following protections: at least 24 hours written notice of the date, time, place, purpose of the hearing and the reasons for the proposed medication; notice of the right to appear at the hearing, to present evidence in support of the inmate's position, to have a staff representative, to request witnesses, and to request that witnesses be questioned by the staff representative or by the person conducting the hearing; a copy of the report generated by the hearing; and notice of the right to appeal the decision and to assistance in appealing the decision. *See* 28 C.F.R. § 549.43(a)(1)-(6).

The hearing is conducted by the hearing officer, a psychiatrist not currently involved in the diagnosis or treatment of the inmate. The hearing officer considers evidence presented by the evaluating psychiatrist and the inmate and then determines "whether treatment or psychotropic medication is necessary in order to attempt to make the inmate competent for trial or is necessary because the inmate is dangerous to self or others, is gravely disabled, or is unable to function in the open population of a mental health referral center or a regular prison." 28 C.F.R. § 549.43(5).

If the inmate appeals an adverse decision, the administrative process is completed when the institution mental health division administrator decides the inmate's appeal. *See* 28 C.F.R. § 549.43(7). The administrator reviews the decision to "ensure that the inmate received all necessary procedural protections and that the justification for involuntary treatment or medication is appropriate." 28 C.F.R. § 549.43(6). If the hearing officer determines that treatment or medication is necessary and the administrator affirms this determination, a psychiatrist other than the attending psychiatrist monitors the patient's treatment or medication at least once every thirty days and documents the

patient's progress in the patient's medical record. *See* 28 C.F.R. § 549.43(8).

The federal prison at Butner further requires the staff representative to sign a memo entitled "Duties of a Staff Representative" to indicate that the person agrees to serve as a staff representative. This memo states that in general the role of the staff representative is "to help the patient present the best alternative possible to the proposed involuntary medication." Dr. Johnson Ltr., Defendant's Appeal of Involuntary Medication Hearing Decision, 59–91(6000) Duties of Staff Representative, Involuntary Medication Hearing (5/20/99 & 7/20/99).[5] In addition, the BOP has elaborated on the regulations with operations memoranda, and the Duties of the Staff Representative memo incorporates these regulations. These memoranda further expand on the staff representative's role:

> The staff representative should be impartial and able to act in the best interests of the inmate. He/she shall meet with the inmate to help prepare for the hearing and must assist at the hearing in presenting the inmate's position. The staff representative shall also help the inmate prepare and submit an appeal if he/she requests assistance or wishes to

appeal but is unable to prepare and submit the appeal.

PS 6010.01 Psychiatric Treatment/Medication, Admin. Safeguards.

### 2. The Administrative Hearings

The defendant argues that the administrative hearings held in his case did not adequately protect his rights on the following grounds.

### a. Dr. Gur's Absence at the Second Administrative Hearing

■ Dr. Gur did not appear as a witness at the second administrative hearing. Rather, at the request of defense counsel, the staff representative submitted Dr. Gur's report as evidence in support of the defendant's position. Furthermore, Dr. Gur's curriculum vitae was not attached to her report. The defendant argues that the absence of Dr. Gur and her Curriculum Vitae constitutes a fatal procedural flaw in the process.

Because of the Court's concerns that the defendant had not been given an opportunity to be heard in a meaningful manner at his first administrative hearing, the Court remanded the initial BOP decision for further proceedings. The defendant was pro-

---

5. These duties are outlined below:
1. You are to assist the patient in presenting whatever information the patient wants to present and in preparing a proposed alternative, if any. This will require in every case, consultations with the patient and familiarity with Operations memorandum 6010.01 dated 09/21/95.
2. You are to speak to witnesses who might furnish evidence on behalf of the patient, if the patient indicates there are such witnesses whom the patient wishes to be called. You may question the witness.
3. You should become familiar with reports relative to the proposed medication. Confidentiality or security information must of course be protected and may not be shared with any other person, including the patient, staff, visitors, attorneys, etc. Any request for confidential information must be directed to the AWHS [Associate Warden of Health Service].
4. You should present any evidence favorable to the patient's position.

5. You should present information which may assist the Administrative Hearing Officer and which may obtain a resolution sought by the patient. If you believe you need additional time to pursue any of these functions, you may request a delay in the hearing, but ordinarily only after you have the concurrence of the patient to do this.
6. You are to help the patient understand the reasons for the proposed medications and the procedures involved.
7. You should be familiar with procedures at the hearing, explain them to the patient in advance, and if necessary, during the hearing, assist the patient in understanding procedural points.
8. If the patient asks you to assist in writing an Appeal from the decision rendered at the hearing, you should assist the patient in doing so. In any event, you should carefully determine the patient's desire to appeal and carefully document his desires.

vided with twelve days notice of the second administrative hearing. At the second hearing the defendant had the opportunity to present both his expert and any evidence his expert wished to offer in support of his stance against medication. Although defense counsel could have requested that the staff representative continue the hearing date so that Dr. Gur could be present, defense counsel did not do so. *See* Duties of Staff Representative Memorandum, at ¶ 5 ("If [the Staff Representative] believe[s][he] needs additional time to pursue any of these functions, [he] may request a delay in the hearing, but ordinarily only after [he has] the concurrence of the patient to do this.") The defendant, therefore, may not now complain that he was denied the opportunity to be heard in a meaningful manner. He had that opportunity.

Concerning the absence of Dr. Gur's curriculum vitae from the evidence submitted at the July hearing, Dr. Johnson testified at the August 20, 1999 hearing that Dr. Gur's report contained a synopsis of her background, that she is aware of Dr. Gur's work, and that the lack of Dr. Gur's curriculum vitae did not affect her assessment of Dr. Gur's medical opinion in this case. *See* Hr'g Tr., at 38–39 (8/20/99).

#### b. Alleged Bias of the Administrative Hearing Process

██ The defendant argues that the administrative hearing process was inherently biased because the hearing officer and the staff representative both ultimately report to Dr. Johnson. The government responds that the defendant has provided no evidence that institutional bias influenced the decision in this case. In rejecting a similar argument, the *Harper* Court reasoned, "[i]n the absence of record evidence to the contrary, we are not willing to presume that members of the staff lack the necessary independence to provide an inmate with a full and fair hearing in accordance with the Policy." *Harper*, 494 U.S. at 233, 110 S.Ct. 1028. The defendant has provided no evidence to support his argument that institutional bias affected the

decision here. The Court, therefore, rejects this argument.

Moreover, the defendant is in the awkward position of urging the Court to credit and discredit Dr. Johnson's diagnoses. On the one hand, the defendant agrees with Dr. Johnson's findings that he suffers from schizophrenia of the paranoid type and that he is not competent to stand trial. On the other hand, the defendant argues that the Court should reject her opinion that the defendant should be treated with antipsychotic medication to mitigate the danger to himself and others and to render him competent to stand trial.

#### c. BOP's Substantive Review of the Hearing Officer's Decision

The defendant argues that although the regulations provide for substantive review of the hearing officer's decision, the decision here was reviewed for procedural error only. As a result, according to the defendant, the review of the hearing officer's decision must be made by a qualified physician.

The Warden's denial of the defendant's appeal states, *inter alia:*

> The record indicates that [the defendant] experience[s] a variety of grandiose and paranoid delusions including a belief that [he is] able to reverse time, and that people who are killed are not really dead. Such delusions have caused [him] to be dangerous to others, and potentially to [himself], gravely disabled, and incompetent for trial. This conclusion is supported by the record.

Response to Appeal of Involuntary Medication Decision, J.R. James, Warden (7/15/99). The regulations provide that "[t]he administrator shall ensure that the inmate received all necessary procedural protections and that the justification for involuntary treatment or medication is appropriate." 28 C.F.R. § 549.43(6). At the first judicial hearing, Dr. Johnson testified that the hearing officer's decision is reviewed for procedural, rather than substantive error. "[T]he warden [ ] reviews

the hearing process and documentation to assure that [it] is consistent with [BOP] policy and adequate to support the decision." Hr'g Tr., at 28 (5/28/99).

The regulations clearly provide that the hearing officer's decision shall be reviewed for compliance with the procedural protections and to ensure that there is evidence to support the justification given for the decision to treat or medicate the inmate against his will. The appeal in this case was denied on two grounds: first, that the hearing was conducted in accordance with the BOP's regulations, and second, that the record supported the hearing officer's determination that the defendant is dangerous to himself and others and incompetent to stand trial. Accordingly, the Court rejects the defendant's argument.

### d. Standard of the Hearing Officer's Determination

■ The regulations do not address the standard of proof by which the hearing officer determined that the defendant could be medicated against his will. At the first judicial hearing, Dr. Johnson testified that when she is appointed to be a hearing officer, she uses the same "degree of certainty" that she uses in other types of medical evaluations—a "reasonable degree of medical certainty" standard. Hr'g Tr., at 114 (5/28/99). In the Court's view, this standard would certainly be consistent with making the medical decisions called upon here.

### 3. Analysis

■ The government argues that the BOP's decision to medicate the defendant against his will should be reviewed by this Court as final agency action subject to a reasonableness standard under the APA. The defendant responds that APA review will be inadequate to protect his interests because of the deference the Court will

give that decision and that he is entitled to a *Brandon* hearing. The Court is again persuaded by the government's argument.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Natural Resources Defense Council, Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995).[6] A court's review under the APA is narrow, and the Court cannot substitute its judgment for that of the agency, *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), which in this case is the BOP. *See Harper,* 494 U.S. at 231, 110 S.Ct. 1028 ("[W]e conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge."); *United States v. Charters,* 863 F.2d 302, 309–310 (4th Cir. 1988)(A judicial rather than medical decision "reflects greater confidence in the ability of judges and adversarial adjudicative processes than in the capacity of medical professionals subject to judicial review to minimize the risk of error in such decision, it flies directly in the face of the Supreme Court's perception on that score."); *Parham v. J.R.,* 442 U.S. 584, 609, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)("[W]e do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge."); *Khiem v. United States,* 612 A.2d 160, 171–72 (D.C.1992)("The reasons for the court to apply a deferential standard of

---

6. The defendant maintains that the government previously asserted that APA review is not available because the decision to medicate is committed to agency discretion. *See* Def.'s Mem. of Law Concerning the Issue of Forced Medication, at 17. The government, however-

er, agreed that this Court has jurisdiction to review the decision under the APA and that the standard of review is whether that decision is arbitrary and capricious. *See* Hr'g Tr., at 16–17 (5/24/99).

review are at their zenith when only the patient's medical interests are at issue."). In the typical case, the Court reviews agency action based upon the administrative record that was before the decision-maker at the time he made his decision. *See Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814. This Court, however, as it did on two occasions in this case, may gather extra-record evidence "when agency action is not adequately explained in the record before the court." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989).

A number of courts have found that review of the BOP's decision pursuant to the APA is adequate to protect a defendant's interests. *See United States v. McAllister*, 969 F.Supp. 1200, 1212 (D.Minn.1997)("This Court finds that it has jurisdiction over this matter by virtue of the Administrative Procedure Act."); *United States v. Horne*, 955 F.Supp. 1141, 1152 (D.Minn.1997)("[J]udicial review is appropriate when the Respondent has exhausted the administrative procedures of 28 C.F.R. § 549.43."); *United States v. Morgan*, Criminal No. 4:98–00428 (D.S.C. Feb. 9, 1999)(finding jurisdiction to review the decision to medicate the defendant against his will under the Administrative Procedure Act). Of course, the *Brandon* court "conclude[d] that due process considerations require a judicial hearing on the issue presented." *Brandon*, 158 F.3d at 955.

Because the agency here seeks to administer unwanted, but medically appropriate, medication to render the pretrial detainee, *inter alia*, non-dangerous to himself and others, the agency's decision here is treated as a purely medical decision. This is clearly distinguished from the situation in *Brandon*, where the government sought to medicate a non-dangerous pretrial detainee solely to render him competent to stand trial. Also, as stated previously, the Court does not find that the legal issues of whether the proposed treatment will interfere with the defendant's Sixth Amendment rights to counsel and to a fair trial to be ripe at this juncture. *Cf.*

*Brandon*, 158 F.3d at 960 ("[T]he district court will then have to make the legal determination of whether Brandon, if forcibly medicated, would be competent to participate in a trial that is fair to both parties. This will require consideration of whether the medication will have a prejudicial effect on Brandon's physical appearance at trial, as well as whether it will interfere with his ability to aid in the preparation of his own defense.").

The BOP may not deprive the defendant of his fundamental right to be free from unwanted medication unless the Court "[finds] that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the defendant's] own safety or the safety of others." *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810. The Court, therefore, must first make these substantive findings.

To make the required substantive findings, the Court held two judicial hearings. At these hearings, the defendant presented the evidence of his expert, Dr. Gur, and extensively cross-examined Dr. Johnson. After making the substantive findings, the question then becomes whether in making its decision the BOP complied with procedural due process. Because the decision at this stage is medical, *see Harper*, 494 U.S. 210, 231, 110 S.Ct. 1028, 108 L.Ed.2d 178 ("[T]he decision to medicate should be made by medical professionals rather than a judge."), traditional APA review suffices to safeguard the defendant's procedural rights.

### III. *Whether the Defendant was Entitled to Representation by Counsel at the Administrative Hearings*

The defendant argues that he was deprived of constitutional rights because he was not represented by counsel during the BOP's administrative hearings. He does not argue that the Fifth Amendment's guarantee to a fair hearing requires representation by counsel, nor could he. *See Harper*, 494 U.S. at 236, 110 S.Ct. 1028

("Given the nature of the decision to be made, we conclude that the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection."). Rather, he argues that his Sixth Amendment right to counsel was violated.

 The test for whether the defendant has a Sixth Amendment right to counsel is whether the accused is "confronted ... by the procedural system, or by his expert adversary, or by both." *United States v. Byers,* 740 F.2d 1104, 1117–18 (D.C.Cir.1984). While the Sixth Amendment right to counsel now attaches in many pretrial settings, *see e.g., United States v. Pena–Gonzalez,* 62 F.Supp.2d 358, 363 (D.Puerto Rico 1999)(finding that the right to counsel attached at death penalty certification hearings), it is clear that there is no right to counsel during a psychiatric interview. *See Estelle v. Smith,* 451 U.S. 454, 471, 101 S.Ct. 1866, 68 L.Ed.2d 359 n. 14 (1981); *United States v. Byers,* 740 F.2d 1104, 1120 (D.C.Cir.1984). While the administrative hearings here constituted more than an interview, the proceedings were essentially medical. Because the medical decision raises substantive due process issues, the defendant's counsel was involved in the second administrative hearing. For example, the staff representative contacted defense counsel and presented evidence from defense counsel in the form of an expert opinion in support of the defendant's position. Furthermore, the defendant had assistance of counsel prior to each administrative hearing. The Court concludes that this degree of involvement by counsel was sufficient to safeguard the defendant's Sixth Amendment rights.

### CONCLUSION

Following two administrative hearings, the Bureau of Prisons has determined that the defendant should be administered antipsychotic medication because: (1) he suffers from a mental disorder, (2) he is dangerous to himself and others, (3) he is gravely disabled, (4) he is unable to function in the open mental health population, (5) he needs to be rendered competent for trial, (6) he is mentally ill, and medication is necessary to treat the mental illness. Following each administrative hearing the Court not only exercised its judicial oversight authority to review the BOP's decision but also conducted judicial hearings to clarify and supplement as appropriate the administrative and evidentiary record in this case. At each of the administrative and judicial hearings, the defendant was allowed to participate, confront and cross-examine adverse witnesses, and offer evidence on his behalf.

The Court has found that the proposed medication is medically appropriate and that, considering less intrusive alternatives, it is essential for the defendant's own safety or the safety of others. The Court has carefully considered the BOP's decision to medicate the defendant over his objection, and the defendant's opposition thereto, and concludes that the BOP's decision is well-reasoned and supported by compelling evidence in the administrative record and in the supplemental record of proceedings before this Court. Indeed, having considered the in-court testimony of Dr. Johnson, the evidentiary proffer of the defendant's expert, Dr. Gur, and the other competent evidence adduced in the record of proceedings before the Court as a result of two judicial hearings, the Court can conclude, by at least clear and convincing evidence, that the proposed treatment is medically appropriate to render the defendant non-dangerous to himself or others. Further, in the Court's view, there are no less intrusive alternatives to the proposed treatment to render the defendant non-dangerous to himself or others.

Without a doubt, the government has a fundamental interest in bringing the defendant to trial and this interest may override a defendant's own liberty interest in remaining free from unwanted medication. *See Riggins v. Nevada,* 504 U.S. 127, 134–35, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992); *see also Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)

(Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace.") parallel citations omitted; *Khiem v. United States,* 612 A.2d 160, 167 (D.C.1992) ("[T]he government's interest [in bringing a murder defendant] to trial is a 'fundamental' one and of a very high order indeed."). Nevertheless, the case law does not clearly indicate whether the government can forcibly medicate a defendant *solely* to render him competent to stand trial. Weston has been charged in a six-count indictment with the premeditated murders of two federal police officers. Arguably, if a compelling case ever existed under *Riggins* that would justify forcibly medicating the defendant solely to become competent to stand trial, this case meets that standard. *Riggins,* however, clearly holds that if treatment is justified on dangerous grounds, the Court need not reach the issue whether the defendant may be treated *solely* to render him competent to stand trial. Thus, this Court need not reach this collateral issue at this time.

Finally, the Court will address briefly the defendant's "Motion and Incorporated Memorandum Seeking Reconsideration of the Court's Ruling Regarding Medical Ethical Issues and to Permit Further Inquiry and Submission of Evidence on this Issue," the government's response and the defendant's reply thereto. At both judicial evidentiary hearings, the defendant has attempted to expand the scope of the issues before the Court to include consideration by the Court of the medical and ethical propriety of medicating the defendant to restore his competency to execute him. The defendant seeks reconsideration of the Court's rulings precluding inquiry into this area; he proffers unspecified evidence along with letters from three law school professors to support his motion. This case, however, does not at this time—and it may never—present the issue of medicating a person to restore his mental competency to execute him. Indeed, not only has this defendant not been arraigned for the serious charges pending against him, but the government has never announced that it would seek the death penalty upon conviction. Should these events ever materialize, however, and assuming, *arguendo,* that the defendant is ever restored to competency, arraigned, tried, convicted, and sentenced to death, this Court's vigilance, as, no doubt, the vigilance of defendant's attorneys, will ensure that the defendant's rights are protected at every stage of those proceedings.

Accordingly, for the reasons articulated in this Opinion, it is

**ORDERED** that the Bureau of Prisons is hereby authorized to administer antipsychotic medication to the defendant, Russell Eugene Weston, Jr., over his objection. The Court will **STAY** this ruling until **September 16, 1999, at 5:00 p.m.** to enable the defendant to file a notice of appeal, and thereafter to seek a further stay of the Court's ruling from the United States Court of Appeals; and it is further

**ORDERED** that defendant's Motion for Reconsideration is **DENIED** without prejudice; and it is further

**ORDERED** that a video conference status hearing is scheduled for **December 20, 1999.** The Court directs that at least one of the defendant's three attorneys be present at the Butner facility to represent the defendant at this hearing. Under the circumstances the status hearing scheduled for **September 9, 1999,** is canceled.

**IT IS SO ORDERED.**