**UNITED STATES of America,**
**Appellee,**

v.

**Russell Eugene WESTON,**
**Jr., Appellant.**

**No. 99–3119.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 6, 1999.

Decided March 24, 2000.

Gregory L. Poe, Assistant Federal Public Defender, argued the cause for the appellant. A. J. Kramer, Federal Public Defender, and L. Barrett Boss, Assistant Federal Public Defender, were on brief for the appellant.

David B. Goodhand, Assistant United States Attorney, argued the cause for the appellee. Wilma A. Lewis, United States Attorney, and John R. Fisher and Erik P. Christian, Assistant United States Attorneys, were on brief for the appellee.

Before: HENDERSON, ROGERS and TATEL, Circuit Judges.

Opinion for the court filed PER CURIAM.

Circuit Judge KAREN LeCRAFT HENDERSON filed a separate concurring opinion.

Circuit Judge ROGERS filed a separate concurring opinion.

Circuit Judge TATEL filed a separate concurring opinion.

PER CURIAM:

Appellant Russell Eugene Weston Jr. appeals the district court's order authorizing the Bureau of Prisons (Bureau) to forcibly medicate Weston with antipsychotic drugs based on the Bureau's determination that the treatment is medically appropriate and essential for Weston's safety and for the safety of others. Because the district court's order relied on testimony supporting forced medication for the purpose of making Weston competent to stand trial, an additional justification which the

Bureau advanced but the district court found unnecessary to reach, we reverse the district court and remand for consideration of both of the Bureau's justifications.

On October 9, 1998 Weston, a diagnosed paranoid schizophrenic, was charged in a six count indictment with the July 24, 1998 murder of two United States Capitol Police officers and the attempted murder of a third.[1] On April 22, 1999 the district court found Weston, who is confined at the Federal Correctional Institution in Butner, North Carolina (Butner), incompetent to stand trial and committed him for treatment to restore his competency pursuant to 18 U.S.C. § 4241(d). The incompetency order provided that, should medical personnel conclude antipsychotic injections were warranted, the Bureau could seek involuntary medication authorization in accordance with "the administrative procedures under 28 C.F.R. § 543 [sic],[2] provided that counsel for Mr. Weston receive reasonable notice before a hearing commences." Appendix vol. i (App. i) 47. The order further directed: "No administration of psychotropic medications to defendant against his will shall occur without the prior approval of this Court in a written Order;...." *Id.*

On May 13, 1999 the Bureau conducted an involuntary medication hearing without notifying Weston's counsel. Weston was represented at the hearing by Ray Pitcairn, the Day Watch Nursing Supervisor at Butner. Following the presentation of evidence the hearing officer, Bryon Herbel, M.D., a psychiatrist, determined Weston should be forcibly medicated. But-

ner's warden affirmed the determination. The district court held a hearing on May 28, 1999 to review the Bureau's decision and in an order dated June 18, 1999 remanded the matter to the Bureau because Weston's counsel had not been notified of the hearing in accordance with the April 22, 1999 incompetency order and because the Bureau had neither sought nor presented at the hearing evidence favorable to Weston.

The Bureau conducted a second hearing before Dr. Herbel on July 8, 1999. Weston was again represented by Pitcairn who presented the written report of Weston's expert witness, Raquel E. Gur, M.D., also a psychiatrist. In addition, Pitcairn offered arguments suggested to him by Weston's counsel, who were not themselves permitted to attend the hearing. The government offered the expert testimony of Sally C. Johnson, M.D., Associate Warden for Health Services at Butner and Weston's treating psychiatrist. At the conclusion Dr. Herbel determined Weston "suffer[s] from a mental illness, and that medication is an appropriate treatment for [his] illness, and that [he] can be treated against [his] will." App. ii 90–91. He explained his decision to Weston as follows:

> The reason is that you are gravely disabled, you pose a risk of dangerousness to others and to yourself without treatment, and that you need to become competent to stand trial, and that no other inter—less intrusive intervention will be successful for them.

1. The indictment charged two counts of murder of a federal officer while engaged in his official duties in violation of 18 U.S.C. §§ 1113 and 1111; one count of attempted murder of a federal officer while engaged in his official duties in violation of 18 U.S.C. §§ 1114 and 1113; one count of carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c); and 2 counts of carrying and using a firearm during and in relation to a crime of violence and causing a death thereby in violation of 18 U.S.C. § 924(c) and 924(j)(1).

2. Bureau regulation 549.43 requires that, before a patient's involuntary medication, a hearing be conducted by a psychiatrist, with 24–hour notice to the patient, at which he has the right to appear, to have a staff representative, to present evidence and to request that witnesses be questioned by his staff representative or by the hearing officer. The hearing officer's determination regarding medication may be appealed to the institution's mental health division administrator.

*Id.* at 91. Weston appealed to the warden who again affirmed the hearing officer, stating:

> Medical staff have diagnosed you with Schizophrenia, Paranoid Type, Chronic. The record indicates that you experience a variety of grandiose and paranoid delusions including a belief that you are able to reverse time, and that people who are killed are not really dead. Such delusions have caused you to be dangerous to others, and potentially to yourself, gravely disabled, and incompetent for trial. This conclusion is supported by the record. Mental Health staff have determined that you suffer from a mental disease which may be treated with psychotropic medication, and restore your competency for trial. Therefore, your appeal is denied and staff may proceed accordingly.

App. ii. 3.

On August 20, 1999 the district court held a second judicial review hearing. In a decision dated September 9, 1999 the court upheld the Bureau's decision to medicate Weston on the ground that "the proposed medication is medically appropriate and that, considering less intrusive alternatives, it is essential for the defendant's own safety or the safety of others." *United States v. Weston*, 69 F.Supp.2d 99, 118 (D.D.C.1999). The court declined to review the Bureau's additional justification, that medication was necessary to render Weston competent for trial, or to address Weston's claim that forced medication would infringe his Sixth Amendment right to a fair trial. These two issues, the court found, were not then ripe "where the defendant has not yet been arraigned and where there is no record evidence to suggest that the government's medical reasons are pretextual." *Id.* at 107. In the court's opinion the issues could adequately be addressed later "[in] the event that medication successfully renders the defendant competent to stand trial." *Id.* Weston contends the Bureau's decision is unsupported by the record and that the Sixth Amendment argument is now ripe for resolution. We agree on both points.

As an initial matter, Weston asserts the district court applied the wrong standards in reviewing the Bureau's determination "that antipsychotic medication is medically appropriate and that, considering less intrusive alternatives, it is essential for the defendant's own safety or the safety of others." 69 F.Supp.2d at 118. Following the Supreme Court's opinion in *Washington v. Harper*, 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the district court reviewed the Bureau's medical/safety justification substantively under a "reasonableness" standard, *see* 69 F.Supp.2d at 116–18, and procedurally under the Administrative Procedure Act's "arbitrary and capricious" test, *see* 69 F.Supp.2d at 107 (citing 5 U.S.C. § 706(2)(A)). Weston maintains that the Supreme Court's decision in *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), in which the court considered forced medication of a detainee, as here, rather than of a convicted inmate, as in *Harper*, requires instead review under the "strict scrutiny" and "*de novo*" standards. It is true the *Riggins* Court recognized that decisions affecting a detainee's trial rights may warrant closer scrutiny than those made for inmates who have already been tried and convicted. *See* 504 U.S. at 135, 112 S.Ct. 1810. ("Under *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords *at least as much protection* to persons the State detains for trial.") (emphasis added; citations omitted). The Court, however, declined to clarify the standards of review for detainees. The opinion makes no mention of the applicable procedural standard and the Court found "no occasion to finally prescribe ... substantive standards." *Id.* at 136, 112 S.Ct. 1810. We likewise need not decide the issue at this point, given the lack of support for the district court's med-

ical/safety determination, preferring instead to await the district court's findings on remand using the guidance that *Riggins* provides.

In *Riggins* the Supreme Court overturned the Nevada state court conviction of a defendant who had been involuntarily medicated during trial. The Court acknowledged, as did the district court below, that involuntary medication may be justified by medical/safety concerns and might be justified by the need to render a defendant competent for trial:

> Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. *See Harper, supra,* 494 U.S., at 225–226, 110 S.Ct., at 1039; *cf. Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (Due Process Clause allows civil commitment of individuals shown by clear and convincing evidence to be mentally ill and dangerous). Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means. *See Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 1063, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace").

504 U.S. at 135–36, 112 S.Ct. 1810. Nevertheless, the Court overturned the state court medication order for inadequate factual findings, in part because it "did not adopt the State's view, which was that continued administration of Mellaril was required to ensure that the defendant could be tried" and did not "indicate a finding that safety considerations or other compelling concerns outweighed Riggins'

interest in freedom from unwanted antipsychotic drugs." *Id.* at 136, 112 S.Ct. 1810. The district court's determination below suffers from similar defects.

 First, although the district court, unlike the state court in *Riggins,* made a finding that antipsychotic medication is not only medically appropriate but also essential to safety, the finding is not supported by the record. The evidence below focused on the feasibility and desirability of restoring Weston's competency. Thus, while the record focused on whether the administration of antipsychotic drugs was "medically appropriate" to make him competent to stand trial, there is comparatively little evidence on the safety issue. Further, what evidence there is indicates that in his current circumstances Weston poses no significant danger to himself or to others. Dr. Johnson herself testified at the August 20, 1999 hearing that, given Weston's "immediate containment situation," she felt confident the Butner staff "can prevent him from harming himself or others under his immediate parameters of incarceration where he is in an individual room with limited access to anything that he could harm himself with or anyone else with, and he remains under constant observation." JA ii 121. In her view, "those precautions are adequate to prevent risk— to prevent episodes of harm to himself or to others." *Id.* In light of this testimony, we cannot sustain the district court's determination that involuntary medication is "essential for the defendant's own safety or the safety of others." 69 F.Supp.2d at 118. If the government advances the medical/safety justification on remand, it will need to present additional evidence showing that either Weston's condition or his confinement situation has changed since the hearing so as to render him dangerous.

 Second, the district court here (like the state court in *Riggins*) failed to address the government's theory that medication is necessary to render Weston competent for trial, describing the trial competency issue as "collateral" and not

yet "ripe." We disagree with this characterization. Involuntary antipsychotic medication has the potential to adversely affect the defendant's ability to obtain a fair trial as guaranteed under the Sixth Amendment. *See United States v. Brandon*, 158 F.3d 947, 954 (6th Cir.1998) (concluding forced medication may implicate Sixth Amendment right); *United States v. Morgan*, 193 F.3d 252, 264–65 (4th Cir.1999) (acknowledging same). Weston's challenge here, based on this potential, is ripe for two reasons. First, as noted above, the evidence, including Dr. Johnson's testimony and the determinations of both the hearing officer and the warden, *see supra* pp. 11–12, focused on the need to restore Weston's competency, placing the issue squarely before the district court. Second, and more important, because antipsychotic medication may affect the defendant's ability to assist in his defense, *see Riggins*, 504 U.S. at 137, 112 S.Ct. 1810; *id.* at 143, 112 S.Ct. 1810 (Kennedy, J., concurring); *Brandon*, 158 F.3d at 954, post-medication review may come too late to prevent impairment of his Sixth Amendment right. Accordingly, both the defendant, whose right to present a defense may be infringed by involuntary medication, and the government, whose eventual prosecution of the defendant may be foreclosed because of the infringement, are entitled to pre-medication resolution of the Sixth Amendment issue.

■ For the foregoing reasons, we reverse the district court's September 9, 1999 memorandum opinion and order and remand for the court to assess each of the Bureau's justifications and to consider the potential impact of compelled medication on Weston's Sixth Amendment fair . trial right.[3] Because the trial competency and Sixth Amendment issues are legal rather than medical or penological issues, on remand the district court should retain jurisdiction to decide them itself. *See Brandon*, 158 F.3d at 960 ("district court [must]

make the *legal* determination of whether [defendant] if forcibly medicated, would be competent to participate in a trial that is fair to both parties," which "is distinct from the medical determination that the medical experts [ ] discuss") (emphasis original).

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

I concur in the majority's opinion but write separately to express my belief that the applicable standards for reviewing an institution's medical/safety determination appear to me, at least, to be the same for a detainee as for a convicted inmate.

In *Washington v. Harper*, 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Supreme Court adopted a substantive "standard of reasonableness" under the Due Process Clause in deciding to involuntarily medicate a prison inmate because "[t]he extent of a prisoner's right under the Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement" and because the reasonableness standard satisfies "the need to reconcile [the court's] longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." *Id.* at 222–24, 110 S.Ct. 1028. Applying this standard, the Court concluded that, "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest," 494 U.S. at 227, 110 S.Ct. 1028. The same reasoning supports applying the reasonableness standard be-

---

**3.** The court should also consider whether there is any merit to Weston's contention that medical ethics preclude ordering a patient medicated in a potential capital case.

fore conviction and the Court recognized as much in *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), noting that "in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others." 504 U.S. at 135, 112 S.Ct. 1810 (citing *Harper,* 494 U.S. at 225–26, 110 S.Ct. 1028).

Procedurally, the *Harper* Court concluded that the role of the courts is simply "to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous under the [substantive due process] standards." 494 U.S. at 228, 110 S.Ct. 1028. "An inmate's interests," the Court concluded, "are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge," *id.* at 232, 110 S.Ct. 1028. Again, the Court's rationale applies no less to a detainee than to a convicted inmate. I therefore believe that the district court correctly adopted as its procedural standard of review the one set forth in the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.,* which permits agency action to be set aside only if it is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *See* 69 F.Supp.2d at 116. I further believe that under this standard the district court properly upheld

the Bureau's determination that antipsychotic medication is "medically appropriate," a finding that is well supported by the record, although the majority opinion correctly holds the evidence does not support the concomitant finding that in his then-confinement situation Weston posed a safety risk to himself or others.*

Finally, far from agreeing with Judge Tatel's apparent concern over the defendant's "presentation" at trial, I see no difference between his potentially altered state then, as compared to his conduct on the day of the murders, and the status of a defendant whose defense to murder is of the "heat of passion" variety. No one would argue that due process requires that the latter duplicate his "hot blood" in court. In any event the testimony of both lay and expert witnesses, whether on direct or cross, will suffice to address any differences in Weston's appearance.

ROGERS, Circuit Judge, concurring:

I concur in the judgment of the court reversing the district court's order and remanding the case for further findings. I write separately principally to note a reservation with regard to the proper standard of review of a regulation of the Federal Bureau of Prisons as applied to a pretrial detainee, and to clarify our reasons for remanding. I also join Judge Tatel's concurring opinion describing the "daunting task" faced by the district court upon remand. *See infra* Tatel, J., concurring at 19.

---

* I say "correctly" only because Johnson expressly opined that Weston was not dangerous "under his immediate parameters of incarceration where he is in an individual room with limited access to anything that he could harm himself with or anyone else with, and he remains under constant observation" *See* Maj. Op. at 13 (quoting JA ii 121). Other testimony from Johnson, however, supports the court's finding of dangerousness. *See* 69 F.Supp.2d at 109 (citing Johnson's opinion that "when she and other staff members go into his room, doing so 'poses some immediate risk of potential harm' to herself and to

those persons" and that "the defendant now refuses to respond to questions regarding suicide") (record citations omitted). I also note that in *Harper* the Supreme Court questioned whether "physical restraints or seclusion are acceptable substitutes for antipsychotic drugs, in terms of either their medical effectiveness or their toll on limited prison resources." *Harper,* 494 U.S. at 227, 110 S.Ct. 1028 (footnote omitted). In the long term such "alternatives" to medication may prove both harmful to Weston and a drain on institutional resources, especially since, if he goes unmedicated, Weston may very well be institutionalized indefinitely, if not permanently.

Confronted with the question of whether a judicial hearing is required before the State may treat a mentally ill convicted prisoner with antipsychotic drugs against his will, the Supreme Court in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), held that, "[g]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interests" *Id.* at 227, 110 S.Ct. 1028.[1] Harper had been convicted of robbery, was incarcerated for approximately four years during which he was mostly housed in the prison's mental health unit, and was then paroled on the condition that he participate in psychiatric treatment. While incarcerated he had consented to the administration of antipsychotic drugs, and while on parole he continued to receive psychiatric treatment. Eventually, he was civilly committed, and his parole was revoked after he assaulted two hospital nurses. Upon returning to prison, he initially consented again to treatment but in November 1982 he refused to continue taking his medications. He subsequently filed a civil action under 42 U.S.C. § 1983 for injunctive relief and monetary damages. *Id.* at 217, 110 S.Ct. 1028. The trial court denied relief and was reversed on appeal by the Washington Supreme Court, which held that Harper had a liberty interest in refusing antipsychotic medication and thus was entitled to a hearing with full adversarial procedural protections. *Id.* at 218, 110 S.Ct. 1028.

The Supreme Court reversed. In the Supreme Court's view, while Harper possessed "a significant liberty interest in avoiding unwanted administration of antipsychotic drugs," due process was met where the State established by a medical finding the existence of a mental disorder likely to cause harm if not treated, and where the antipsychotic medication was prescribed by a psychiatrist, with the approval of a reviewing psychiatrist. *Id.* at 221–22, 110 S.Ct. 1028. The Court noted that such protections "ensure[d] that the treatment in question will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his institutional confinement." *Id.* at 222, 110 S.Ct. 1028. Noting "[t]he legitimacy, and the necessity of considering the States' interests in prison safety and security," the *Harper* Court concluded that "the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is ... whether the regulation is 'reasonably related to legitimate penological interests.'" *Id.* at 223, 110 S.Ct. 1028 (citation omitted). Most pertinent here, the Supreme Court explained that this standard applies "even when the constitutional right claimed to have been infringed is fundamental, *and the State under other circumstances would have been required to satisfy a more rigorous standard of review.*" *Id.* (emphasis added). In other words, the Supreme Court observed, while "inmates retain at least some constitutional rights despite incarceration.... th[is] standard of review ... applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Id.* at 223–24, 110 S.Ct. 1028.

Subsequently, in *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), the Supreme Court addressed a claim by a pretrial detainee on direct appeal from his convictions that his right to a fair trial was denied under the Sixth and Fourteenth Amendments by the refusal to suspend the administration of an antipsychotic drug during his trial. Shortly after his arrest, Riggins had complained of hearing voices and a psychiatrist prescribed Mellaril, an antipsychotic drug. The psy-

---

1. In so holding, the Supreme Court focused solely on the protections afforded the prisoner under the Due Process Clause of the Fourteenth Amendment. *Id.* at 213, 110 S.Ct. 1028.

chiatrist later increased the dosage in response to Riggins' continued complaints. *Id.* at 129, 112 S.Ct. 1810. After he was found competent to stand trial, and after a hearing at which the trial judge denied his motion to have the medication suspended until the end of his trial, Riggins presented an insanity defense and testified on his own behalf at trial. *Id.* at 130–31, 112 S.Ct. 1810. The jury found him guilty and he was sentenced to death. *Id.* at 131, 112 S.Ct. 1810. The Nevada Supreme Court affirmed his convictions, rejecting Riggins' claims that forced administration of Mellaril denied him the ability to assist in his own defense and prejudicially affected his attitude, appearance, and demeanor at trial, and that the State had neither demonstrated a need to administer Mellaril nor explored alternatives to giving him 800 milligrams of the drug each day. *Id.* at 131, 112 S.Ct. 1810. The Supreme Court reversed and remanded, concluding that "[i]t is clearly possible that [the] ... side effects [of antipsychotic medication] had an impact upon not just Riggins' outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." *Id.* at 137, 112 S.Ct. 1810.

In considering Riggins' "core contention that involuntary administration of Mellaril denied him 'a full and fair trial,'" the Supreme Court noted that its decision in *Harper* "provides useful background for evaluating this claim." *Id.* at 134, 112 S.Ct. 1810. But contrasting the circumstances in *Riggins* with the "unique circumstances of penal confinement" that had tempered its determination in *Harper* of what process is due a convicted prisoner, the Supreme Court stated that "[t]he Fourteenth Amendment affords *at least* as much protection to persons the State detains for trial." *Id.* at 135, 112 S.Ct. 1810 (emphasis added). While the Court stated that it was not adopting a standard of

strict scrutiny, as it had "no occasion to finally prescribe such substantive standards...." 504 U.S. at 136, 112 S.Ct. 1810, it nonetheless was clear that the Supreme Court did not simply apply the *Harper* standard. *Id.* at 156–57, 112 S.Ct. 1810 (Thomas, J., dissenting).[2]

The Constitution and the Supreme Court long have recognized that the rights of a convicted prisoner are different from those of a pretrial defendant. *See* U.S. Constitution, Amends. V & VI; *Riggins,* 504 U.S. at 135, 112 S.Ct. 1810; *Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Similarly, the standards are different depending on whether the commitment because of mental illness occurs before or after a criminal trial. *Compare Addington v. Texas,* 441 U.S. 418, 428–29, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), and *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), *with Jones v. United States,* 463 U.S. 354, 370, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). To the extent that Weston is in custody by reason of his incompetency to stand trial, the relevant issues are at least his dangerousness to himself and others, and the government's ability to bring him to trial. But until he is convicted, Weston's rights and the relevant issues must be viewed through a somewhat different prism than those for a convicted prisoner. Weston's custodial status does not entail the relinquishment of all rights that a person facing trial possesses, and *Riggins'* departure from *Harper* signals as much. In other words, the issue raised by Weston was not settled in *Harper.* But see concurring opinion of Henderson, J., at 14–15.

The Supreme Court may ultimately articulate a standard for pretrial detainees that is different from the one applied in *Harper* to a prison inmate, particularly with regard to protection of a pretrial de-

**2.** See *Riggins,* 504 U.S. at 156–57, 112 S.Ct. 1810 (Thomas, J., dissenting) ("Either the Court is seeking to change the *Harper* stan-

dards or it is adopting different standards for detainees without stating its reasons.").

tainee's right to a fair trial. *See, e.g., United States v. Brandon,* 158 F.3d 947, 956–60 (6th Cir.1998) (citing *Bee v. Greaves,* 744 F.2d 1387, 1393–94 (10th Cir. 1984)). Rather than foreclose the issue in this circuit at this point, I agree that the court should await the decision of the district court on remand to provide a record and analysis that can be helpful for review on appeal. See opinion at 13. As the record now stands, notwithstanding the district court's commendable effort to get a handle on a difficult issue, the district court made insufficient findings and did not consider all of the factors. And *Riggins,* while declining to enunciate explicitly the applicable substantive standard, nonetheless provides significant guidance to the district court on the nature of the relevant inquiry. See opinion at 13 quoting *Riggins,* 504 U.S. at 135–36, 112 S.Ct. 1810.

As suggested by the language comprising this guidance in *Riggins,* the district court on remand must explore fully both the dangerousness and trial competency rationales for granting the government's motion. The government sought forced medication of Weston for two reasons: to address Weston's dangerousness to himself and others, and to make him competent to stand trial. The evidence before the district court focused on the latter, but the district court ruled that the forced administration of the medication was justified because of Weston's dangerousness. As a result, there was no searching inquiry into whether less intrusive alternatives would have been sufficient to control any potential danger posed by Weston to himself and to others. *See* opinion at 13. Insofar as we hold that the question of whether forced medication is necessary to achieve competency for trial is ripe for adjudication, the district court must also make a searching inquiry into whether less intrusive alternatives would make Weston competent to stand trial. There also remain the attendant ethical issues Weston raises that the district court must address.

In addition, the district court must address the effect of the forced administration of drugs on Weston's right to a fair trial. The district court noted that Weston had argued that the Bureau of Prisons' "decision to medicate him against his will implicates his Fifth Amendment liberty interest in being free from unwanted medication, his Sixth Amendment rights to a fair trial and to counsel, and his First Amendment right to free expression." Concluding that where Weston had not been arraigned and there was no evidence that the government's medical reasons were pretextual, the Due Process Clause required the government only to satisfy *Riggins'* "medically appropriate" standard, 504 U.S. at 135, 112 S.Ct. 1810, the district court further concluded that if the medication rendered Weston competent to stand trial the court could then address his argument that the Due Process Clause or the Sixth Amendment required a heightened standard before he could be forcibly medicated during trial. The issues of trial competency and fair-trial rights are distinct but they are not as separate as the district court suggests. Weston raised a preliminary fair trial issue that is inextricably linked to the determination of whether forced medication is necessary to render him competent to stand trial and otherwise appropriate.

The district court, in ruling on the government's motion, must consider several conflicting factors, including Weston's right to trial and counsel, his right to be free from bodily invasion, the government's interests in protecting his and others' physical safety and in bringing him to trial. Whether the underlying issue is described simply as a matter of whether the government has met its burden of proof or as a balance between the government's interests and Weston's rights, the issue of whether Weston's right to a fair trial will be unnecessarily or impermissibly infringed cannot be postponed altogether. His fair trial rights implicate the rights of both parties, for the government has a right to know whether by medicating Weston it

will forfeit the right to bring him to trial, and if not, what conditions are to be placed on his medication in order to preserve the prosecution. Indeed, Weston contends that ethical considerations preclude the forced administration of psychotic drugs to make him competent in order to sentence him to death. While other issues on the conduct of a trial are appropriately addressed at a later time, as the district court acknowledged, that circumstance does not make unripe the preliminary questions that Weston has raised. As discussed in Judge Tatel's concurring opinion, the district court must engage in a searching examination of whether forced medication will impermissibly interfere with Weston's right to a fair trial in light of the serious and complicated issues raised by the effects that such medication may have upon Weston's demeanor at trial and his ability to assist in his own defense. *See infra*, Tatel, J., concurring at 20–22.

TATEL, Circuit Judge, concurring:

Cure her of that.
Canst thou not minister to a mind diseas'd,
Pluck from the memory a rooted sorrow,
Raze out the written troubles of the brain,
And with some sweet oblivious antidote
Cleanse the stuff'd bosom of that perilous stuff
Which weighs upon the heart?
WILLIAM SHAKESPEARE, MACBETH, act 5, sc. 3.

Centuries after Macbeth pleaded with his doctor to cure Lady Macbeth, a "sweet oblivious antidote" exists. Psychotropic drugs like Haldol and Mellaril, for example, are routinely prescribed for schizophrenia. Powerful enough to "[r]aze out the written troubles of the brain," psychotropic drugs can also adversely affect a criminal defendant's right to a fair trial. *See Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992).

I agree with my colleagues that this case must be remanded for the district court "to assess each of the Bureau's justifications [for forcibly medicating Weston] and to consider the potential impact of compelled medication on Weston's Sixth Amendment fair trial right." Op. at 14. I also agree with Judge Rogers' standard of review discussion, as well as with her explanation regarding why the fair trial issue is ripe. I write separately to set forth some thoughts about the daunting task the district court faces.

First, a little more about Russell Eugene Weston. Forty-three years old and having a history of mental illness, Weston has lived with family members for most of his life. He has worked for only brief periods as a laborer, maintenance man, and mechanic. The prison psychiatrist who treated Weston and who concluded that he was not competent to stand trial, Dr. Sally Johnson, reported that Weston told her the following: While "working for NASA" in the early 1980's, he developed a "Ruby Satellite System," a powerful reverse time machine that enables users to "push time in reverse.... by passing us through the Jurassic Sea, putting us into another time frame." For those like Weston with access to the "Ruby Satellite System," nothing is permanent—the user can simply reverse time. If convicted and executed, Weston will "simply be time reversed, put into a safe in the Capitol, and be able to resume his life at whatever point he chooses."

Weston gave Dr. Johnson considerable detail about the Ruby Satellite System. Although the system was originally used infrequently, "those who are now in control are basically cannibals." They have overused the system and "worn time down to ½₂ of one element of time," spawning the development and spread of "Black Heva," a disease similar to HIV or the plague. Black Heva "result[s] from human corpses rotting, turning black, and spreading the most deadliest disease known to mankind." Black Heva will soon reach "epidemic proportions," killing thirty-five percent of the people in the United States. System over-

use also has resulted in "computers not working right, bones being irregularly shaped, telephone poles and electric poles being uneven, buildings leaning, ... rock structures distorting and swelling, [and] unequal ground swelling and wide spread earthquakes." Users can access the Ruby Satellite System through three different consoles, one of which is on the first floor of the U.S. Capitol and has the capacity to override the entire System. Located in the "great safe of the U.S. Senate," the override console is accessible through a "room that is entered by going in the front of the Capitol and taking a door to the left, next to the elevators." Because "time was running out," Weston had to get to the override console in the Capitol so that he could stem the spread of Black Heva and prevent further calamities.

On remand, the district court must answer the following question: In pursuing its right to try Weston for murdering two Capitol police officers, can the government, in order to make Weston competent to stand trial, forcibly medicate him without impairing his right to a fair trial as guaranteed by the Fifth and Sixth Amendments? Weston's fair trial rights include rights (1) not to be tried unless he is competent to "consult with counsel, and to assist in preparing his defense," *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); (2) to testify and "present his own version of events in his own words," *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); (3) to be present in the courtroom at every stage of the trial, *see Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); and (4) to present a defense, including an insanity defense. *See* 18 U.S.C. § 17 (setting forth requirements for insanity defense).

Forcible administration of psychotropic drugs can burden these fair trial rights in several ways, one of which is through the drugs' various side effects. *See, e.g., Riggins,* 504 U.S. at 141–44, 112 S.Ct. 1810 (Kennedy, J., concurring); *Washington v. Harper,* 494 U.S. 210, 229–30, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). The medication can cause parkinsonism, which is "characterized by rhythmical muscular tremors, rigidity of movement, ... and [a] masklike" face or expression, PDR MEDICAL DICTIONARY 1301 (1995); akathisia, a "syndrome characterized by an inability to remain in a sitting posture, with motor restlessness and a feeling of muscular quivering," *id.* at 41; and tardive dyskinesia, "a syndrome consisting of potentially irreversible, involuntary dyskinetic movements ... characterized by rhythmical involuntary movements of tongue, face, mouth, or jaw (e.g., protrusion of tongue, puffing of cheeks, puckering of mouth, chewing movements)." PHYSICIANS' DESK REFERENCE 2000 at 2156; *see also Harper,* 494 U.S. at 230, 110 S.Ct. 1028. Should any of these side effects occur, Weston could find it difficult if not impossible to focus on the testimony of witnesses or to assist counsel with his defense. *Riggins,* 504 U.S. at 137, 112 S.Ct. 1810.

In addition, jurors' perceptions of Weston's character could be adversely affected if as they watch him react to particularly emotional testimony—for example the testimony of the officers' co-workers—his expression is "masklike" or he is constantly rhythmically moving. The tendency of psychotropic medication to flatten or deaden emotional responses could also be damaging, particularly if the government seeks the death penalty, for the jury would then be especially sensitive to Weston's character and any demonstrations of remorse (or lack thereof). *See Riggins,* 504 U.S. at 144, 112 S.Ct. 1810 (Kennedy, J., concurring). Justice Kennedy put it this way in his concurring opinion in *Riggins*:

[S]erious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender

and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.

*Id.* at 143–44, 112 S.Ct. 1810.

Because the district court focused on the safety issue, the record contains little information about the possible effects of medication on Weston and nothing at all about their impact on his fair trial rights. On remand, therefore, the district court will need to explore questions like the following: How likely is it that these side effects will actually occur? How severe are they likely to be? Can side effects be mitigated or controlled by reducing the dosage, changing the type of medication, or administering medication to counteract these effects, and if so, can this be accomplished without reducing the drugs' potential for controlling delusions? Considering the answers to such questions as well as Weston's previous experience with psychotropic drugs, the district court will have to determine whether it is likely that the drugs will so adversely affect Weston and the jury's perception of him that he will be unable to obtain a fair trial. Of course, the difficulty inherent in predicting how a particular drug will affect a particular individual may well lead the district court to conclude that it cannot make this determination about Weston without first medicating him. In that event, I see no reason why the potential for side effects would preclude the district court from ordering medication, provided that, should Weston become competent to stand trial, the district court conducts a second hearing to determine the extent to which any side effects Weston is *actually* experiencing might affect his fair trial rights.

Regardless of how the district court resolves the side effects issue, it will also have to consider the impact of the drugs' intended effect—actually controlling Weston's delusions—on his fair trial rights.

Rendering Weston nondelusional may impair his ability to mount an effective insanity defense. Anyone reading Dr. Johnson's description of Weston's delusions might well doubt that Weston truly believes them, yet he convinced Dr. Johnson, an experienced prison psychiatrist. Dr. Johnson, of course, interviewed Weston in the unmedicated, delusional state he was in when he allegedly committed the crime. Will a jury that sees and hears a different Weston, one who is medicated and nondelusional, be as likely to believe that he truly thought there was a Ruby Satellite System? I think the answer is obvious. A jury listening to a non-delusional Weston explain, perhaps quite passively, that at the time of the crime he believed he had to save the world from the Ruby Satellite System will be considerably more skeptical than a jury that sees and hears the person Dr. Johnson saw and heard: Russell Weston, delusional and unmedicated, explaining in the present tense that there *is* a "Ruby Satellite System" and that he in fact went to the Capitol in search of the override console to save the country from "human corpses rotting, turning black, and spreading the most deadliest disease known to mankind."

Were Weston's testimony the only way for him to present an insanity defense, I would thus have serious doubts about whether the government could involuntarily medicate him. Unlike requiring a defendant to shave or wear glasses at trial, actions which merely restore a defendant's appearance to what it was at the time of the crime, *see United States v. Emanuele,* 51 F.3d 1123, 1132–33 (3d Cir.1995), forcible medication chemically alters the brain and deprives the jury of the opportunity to observe the defendant in the delusional state he was in at the time of the crime. To be sure, due process does not require that a defendant presenting a "heat of passion" defense "duplicate his 'hot blood' in court." Henderson, J., concurring at 2–3. But because such a case involves no action by the government, it has nothing to

**22**

do with the issue before us. Here the question is whether due process permits the *government* through involuntary administration of psychotropic drugs to alter the defendant so that it becomes impossible for him to appear before the jury as he was when he committed the crime. No one would suggest that the government may prevent a defendant claiming insanity from presenting relevant evidence about his delusions. From a due process perspective, forcibly administering psychotropic medication—what Justice Kennedy called "manipulat[ing] the evidence"— seems no different. *Riggins*, 504 U.S. at 142, 112 S.Ct. 1810 (Kennedy, J., concurring).

But Weston's testimony may not be the only way for him to present an effective insanity defense. Although at one point during oral argument defense counsel took the position that compulsory medication, by rendering Weston non-delusional, would necessarily violate Weston's fair trial rights, at another point he suggested that an effective insanity defense might be presented through the testimony of Dr. Johnson, perhaps assisted by videotapes of Weston. On remand, therefore, the district court should review the tapes to determine whether they show Weston in his delusional state, and if so, whether, when combined with psychiatric testimony, they would enable defense counsel to mount an effective insanity defense.

A final point: In assessing whether compulsory medication would deprive Weston of a fair trial, the district court should keep in mind that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see also Rock*, 483 U.S. at 55, 107 S.Ct. 2704 ("[T]he right to present relevant testimony is not without limitation [and] may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.") (internal quotation marks omitted); *Allen*, 397 U.S. at 342–45, 90 S.Ct. 1057 (holding that although a defendant has a constitutional right to be present at trial, expelling an obstreperous defendant does not unconstitutionally infringe that right).